therefore hear argument first this morning in Boatright v. U.S. Bancorp 20-4236. Counsel? Mr. Mullin? May it please the court, and good morning, your honors. This is a case involving claims of wage discrimination and retaliation, where the EEOC found probable cause, and yet the United States District Judge dismissed it on summary judgment. The finding of probable cause appears at page 8, 1392-1393, and the court will note that in finding, I should say, reasonable cause to believe that there was discrimination with regard to compensation because of my client's race and sex, that the EEOC director complains that… …is of any consequence whatsoever for whether the U.S. District Court or Court of Appeals finds probable cause or finds a case. I find that a most surprising proposition. I mean, a judge rules on the evidence before the judge, and the fact that the EEOC or Tom Jones or Fay somebody thinks there is probable cause has really very little to do with whether the court that has the evidence before it should find in favor of the plaintiff or the defendant. We don't disagree with each other, your honor. It's true that the court… Then why are you talking about the fact that the EEOC found probable cause? Because the EEOC in its finding talks about the withholding of information from it, and that becomes relevant to this case because of mendacity that was shown towards the EEOC and mendacity that appears in the defendant's pleadings in this case. What I want to start with is that the court below basically abandoned the summary judgment standard by finding that the plaintiff's 56.1 submissions were inadequate, and therefore the court would treat all of the defendant's facts or most of the defendant's facts as, quote, undisputed. This was a reversal of the summary judgment standard in violation of the rule that the court should view all the evidence in the light most favorable to the plaintiff and to draw reasonable inferences from it. The finding of the court that there were deficiencies, failure to cite evidentiary evidence in the 56.1 submissions of plaintiff was dead wrong. I've detailed in my brief that every single paragraph that the court relied upon in its opinion, we answered, plaintiff answered with detailed citations to the record. So when the court said that, that was wrong, and the court never should have then abandoned the summary judgment standard and treated defendant's facts as undisputed. This error, this decision to read the facts in a light most favorable to the defendants and to draw reasonable inferences in defendant's favor led to serious errors of analysis, both as to discriminatory intent and retaliatory intent. Counselor, if I may, may I focus on the idea of compensation? Do you dispute the fact that a lot of the salary differential had to do with the incentive pay? No, I don't dispute that. And do you argue that setting up an incentive pay structure like that was somehow pretextual? No, it was not pretextual. It was a legitimate salary pay structure that was applied in a discriminatory way. How is that? Well, the evidence of discriminatory intent is circumstantial evidence, as it usually is, because companies don't say we're discriminating. They don't give me memos to that effect. The first example of discriminatory intent has to do with mendacity. And in St. Mary's Honor Center and in Reeves, the Supreme Court has said that where there is mendacity as to a material fact, a court may infer discriminatory intent sufficient to send the matter to a court. You're not arguing that the incentive structure was impossible and you're not disputing that there was no pretext to setting up that incentive structure. So I need some help hearing how it is that you think the discrimination came into how she was being paid. Her boss, Mr. Wallace, was discriminating against her right out of the box. Right out of the box, they hire Nagelson, who, as I've said in my brief, was completely unqualified for the job. He didn't meet what were called essential qualifications on the job description by the bank. So are you arguing that the I'm just I'm trying to figure out what it is that we're supposed to be looking at? Are you arguing that paying him more in the beginning was a discriminatory act? Yes, it was. It set the stage for it, set the pattern for the rest of her four years there. OK, so the so the discrimination we are supposed to be addressing is the fact that they were hired at different amounts when coming in or that they were being compensated at different amounts when they were coming in. That's what you're asking us to focus on. That's what the first act of discrimination was. It was it was an enormous differential. The act of mendacity I've been trying to get at is in the EEOC and in their amended answer and answer. This company first claimed there was no pay disparity. This is important. They submitted a document to the EEOC with a chart that claimed that my client got about two hundred five thousand a year and Nagelson got about two hundred twenty five thousand. But the difference, again, had to do with the incentive pay. Right. This was not that you have said that you've said is not improper. I'm trying to point to the kind of evidence plaintiffs lawyers have at their disposal to try to show discrimination. Yes, sir. May I perhaps clarify for you? I take it that you're relying largely on analytics in which the panel determined that a series of misrepresentations by the employer to the EEOC about why justifying the adverse action was enough to show that the justification was contextual. Yes. Thank you, Your Honor. And that thank you, Your Honor. So you're relying almost entirely on that. I'm relying centrally on that. There's more evidence, which in these. Understood. Understood. That is the thrust of your argument. Yes, Your Honor. Thank you. And so and so when when you look at the response of the employer here. To the EEOC, they acknowledge the difference in compensation between your client and Mr. Nagelson, correct? They portray it as a de minimis difference of about 20,000. They don't actually say de minimis. They say that there is a there is a difference in compensation. They provide a chart and it shows at least a couple of tens of thousands of dollars in difference. 20,000. And your point is that actually the compensation difference was much more significant than that. The chart's a lie. But the difference appears on page seven in the chart that we derived. The chart itself just said just describes base compensation. No, it doesn't. It labels that column compensation history. And it answers a question that appears from the EEOC on page A1356 seeking total compensation. A1356 is is seeking total compensation. And you'll see the question that's repeated in the defendant's letter. And then they say we're answering this request for total compensation in Exhibit 18. Exhibit 18 appears on page A1359. And there's a column labeled not base pay compensation history. So the question the question you want us to answer to try to answer is whether that discrepancy, if you want to describe it as a discrepancy, is enough. Under Andalax and some subsequent decisions to at least cast doubt on the justification such that we really got to consider whether the justification was pretextual. Is that right? Yes, Your Honor, because of the Hicks and Reeves principle that if you're lying about a material issue, a reasonable jury can conclude you're lying about other material facts, including whether there's discrimination, whether there's retaliation. And your view is that the fact that they acknowledge a difference in compensation is not is is is not enough. They needed to acknowledge the actual difference in compensation. Yes. So the fact there's a fourteen hundred percent difference between the truth and the twenty thousand dollar delta, they told the IRS. Now they repeat this this fabrication in their answer and then in their amended answer in response to our paragraphs, alleging that there is a pay disparity and they issue flat denials. Paragraph thirty three, thirty four and thirty six. In their answer, they deny the paragraphs where we say there is a pay disparity between these two. In other words, their first line of defense was to pretend there was no pay disparity. They carried the lie they told the EEOC into their federal pleadings. And I submit I submit that this is strong evidence. This is the kind of mendacity Scalia. So if there were no other evidence, so in Andalus, there was other evidence of discriminatory animus. I don't like to use the word animus, but discrimination based on a particular category. Would you would you agree that if there were no other evidence other than this justification, this this discrepancy in the justification provided by the employer, that that might not be enough? I wouldn't agree, but I don't have to, Your Honor, because there's plenty of other evidence of discriminatory animus. There's there's you start with the fact that a guy who is unqualified for the job, according to the company's job description, didn't have an MBA, had no experience leading anybody but one person. As compared to my client with a Wharton MBA meeting that requirement and and and 20 years leading whole financial teams. And he gets paid hundreds and hundreds of thousands more than she does right out of the box. That prima facie case is strong. And then the company, you know. Yes. I think we've got the central argument, unless there are any other questions for my colleagues. So we'll hear from Mr. I have I have. Oh, OK. Which is one of the things that strikes me throughout this is that at least as viewed by management, the person you're comparing her to was viewed as a as a good employee and she was viewed as a bad employee. That seems to me to be a not a discriminatory explanation for for a discriminatory salary. But when when you have somebody who is a satisfactory employee and one who you want to keep and want to encourage, you pay that person more than one who is disappointing and is constantly the subject of complaints and criticisms. Now, you may say that all the complaints and criticisms, which came from many different quarters, were all discriminatory. But but she was viewed as a problematic employee who drew lots and lots of complaints for various reasons. And he was viewed as a good one. So you have that one comparison. You say this person was paid a lot more than her. Why isn't that explained by the fact that he was viewed as somebody who was a good employee and she was viewed as one who was a problematic one? Constantly a cause of complaints. My client was not reviewed as problematic until in December 2014. She complained to the highest level about discrimination. Then a paper trail was created that I've detailed in my brief can't possibly detail here full of false allegations. You will note that when she can't get on with others, one of the one of the fake criticisms that are generated by Mr. Wallace, you'll notice that none of those people have testified below. There were no defendants declarations by co-employees saying anything that was being said in this false narrative generated almost immediately. After my client complained of discrimination before that, no paper in a file, not in 2012, 2013, 2014. She complained of discrimination and they started to create a paper trail that I detail in high detail in my brief. And it's a classical case of retaliation. They're using the paper trail they created to retaliate here in this court, the false narrative that was created. I know I don't have time. I know you have a big calendar. The details are laid out. No, no, no. Well, we've cut you well past your time. But you've got some time for rebuttal. We'll hear from Mr. Stoler. Thank you, Your Honor. Good morning. Morning, Your Honors. May it please the court. My name is Jonathan Stoler, attorney for Pelley's U.S. Bank Corp, U.S. Bank National Association and U.S. Bank Corp investments. Your Honor, the district court properly granted summary judgment on Miss Boatwright's gender and race based pay discrimination claims that were brought under Title 7, the New York State human rights law and the New York City human rights law. Likewise, we submit that summary judgment was properly granted as to Miss Boatwright's retaliation claims under the same federal, state and city statutes. And we ask that the district court's decision on each of those claims be affirmed in all respects. Can you would you just please address what your friend on the other side described? This is central, not the only, but the central trust thrust of his argument relating to the shifting explanations for the compensation gap, as well as perhaps determination. Your Honor. Um, let me first address counsel's representations in terms of what was said to the EOC as, as, as the court just correctly noted. Appellees have never wavered on the fact that Mr. Nagelson was paid more than Miss Boatwright through the entirety of the relevant time period here. Mr. Counsel for appellants seems to indicate that only base compensation information was provided to the EOC, which the court correctly noted still showed that Mr. Nagelson was paid more than Miss Boatwright at all relevant times. However, what counsel fails to address is the fact that incentive compensation information was also sent to the EOC. And where is that? Well, I point the court's attention to record site A2493-95. This is a September 8th, 2017 letter from U.S. Bank's prior defense counsel, indicating to the EOC or reminding the EOC that over 900 pages had been sent through its electronic portal. And that documents, including incentive compensation information was sent to, to the EOC. But in any event, again, as, as the court has just previously noted, whether or not Mr. Nagelson was paid $25,000 more than Miss Boatwright or hundreds of thousands, hundreds of thousands of dollars more than Miss Boatwright. The fact remains that Mr. Nagelson was for legitimate business reasons, compensated more than Miss Boatwright. So there has never been a contradicting statement given to the EOC. With respect. What are those page numbers again? Sure. A-2493-95. Okay. Okay. Thank you. Okay. Appellees gave conflicting responses in the answer to the complaint. Counsel has referred to paragraphs 33, 34 and 35 of the underlying complaint. Paragraph 33 begins upon information and belief during plaintiff's tenure with the defendant bank. It discriminated against plaintiff by paying her at rates less than the rate at which it paid Mr. Nagelson, and it goes on. We denied that that allegation and that was a proper denial. The next paragraph says paragraph 34 says at the time plaintiff was hired. The defendant bank paid her at a lower salary slash compensation than Mr. Nagelson, the West Coast regions managing director. We denied that allegation as well because the salary slash compensation encompasses not only base salary, but incentive compensation. And at the time that plaintiff was hired, she certainly had the ability to earn just as much, if not more than Mr. Nagelson through the incentive compensation plans. With respect to paragraph 35 of the complaint that reads, in addition, in April of 2015, the defendant bank promoted Mr. Nagelson, claiming that he was promoted because he had greater resources than plaintiff. It goes on, but that paragraph was also denied and properly denied because that was not the reasons why Mr. Nagelson was promoted. He was promoted because of his skill, because of his demonstrated ability, and because of the fact, most notably, that he had already had a series 53 supervisory license. So with respect to those. What was her license? It was a series seven? She actually had no license. No license. No. No. So, I believe that addresses counsel's arguments with respect to alleged contradicting statements made to the to the EOC. With respect to counsel's arguments in connection with the lower courts crediting Appellee's 56-1 facts as undisputed. Essentially, appellant is asking this court to overlook her failures to comply with local rule 56-1. And there's multiple reasons why these arguments must be rejected. First, appellant is asking this court to employ an incorrect standard of review, a de novo standard, in connection with the lower court's evidentiary determinations. Of course, the correct standard here is an abusive discretion standard, which is a much higher standard. And I refer the court to its decision in Berry, B-E-R-I-E, 750 Fed Appendix 41. That was decided by the Second Circuit in 2018. What was that citation? 750 Fed Appendix 41. Now, you're saying that the standard of review for a grant of summary judgment is abusive discretion? No, Your Honor. I'm suggesting that the standard for review of a lower court's evidentiary determinations is abusive discretion. Your Honor is correct that with respect to the overriding summary judgment motion, this court does review, conduct a de novo review. But Berry stands for the proposition that with respect to evidentiary determinations, an abusive discretion standard is what is used. Local rule 56-1 is very clear. If a party doesn't dispute a material fact with appropriate citations to admissible record evidence and in accordance with the mechanics and formality of the rule, then the counterparty's statement of facts are deemed undisputed and admitted. And a simple review of the party's 56-1 statements make very clear that the lower court correctly adopted Appellee's stated facts as largely undisputed because Appellant failed to properly comply with the local rule. And when this court conducts its own review, it'll see that Appellant failed to properly dispute material facts set forth in Appellee's 56-1 with appropriate citations and admissible evidence. Instead, she offers excuses or arguments for why the facts played out as they did. And again, that is improper as a matter of law. There are many examples of just how wrong Appellant has gotten this issue. I'll direct the court just to one example. In Appellee's reply brief, she claims that U.S. Bank misrepresented the record by failing to correctly cite to revenue generation information that was referenced in paragraph 117 of its 56.1. That is on the record site there is A-173. But a simple review of paragraph 117 shows that Appellee's did describe and identify revenue generation and the revenue figures. That was cited in Stoler Exhibit 19, Stoler Exhibit 46, and Ms. Boatwright's own testimony where she said she had no basis to refute the accuracy of the revenue chart information. The record sites there are 2-A498, 11-A2741, and 2-A309. When you really look at Appellant's briefing, it seems that Appellant is confusing her paragraph numbers. She references paragraph 117 as this example, but she's actually quoting paragraph 116 in her briefing. And that paragraph relates to the bonuses that Nagelson was paid and the fact that he was viewed as a top performer. So, Counselor, if my colleague believes you've adequately answered the questions posed, I'd like to move on to the issue of the retaliatory paper trail. Did she ever, before December of 2014, receive anything in writing that people had been complaining about her difficulty in working with her? So, Your Honor, the record shows that Appellant was advised of many of the performance issues that also were present post-December 2014. These are documented, and these certainly predated the 2014 complaint. Those issues include interpersonal difficulties with Mr. Conte and Mr. Yandun, who had complained about working with Ms. Boatwright. The record sites there are 1-A267268 and 2-A-328. Ms. Boatwright was also among the lowest revenue generators in 2013 and 2014. I want to focus, though, on the paper trail, if I may. So, a few days after she told someone in HR that she was being discriminated against because of race, there was a private email being written with a whole list of people that were complaining. Is it your position, are you asking us to infer that that was solely for the purpose of evaluation? Well, it was, Your Honor. In fact, that was a continuation of an effort that began prior to December 17th of 2014 when Ms. Boatwright… Well, then why was it so one-sided? Generally, when people do performance evaluations, they aren't asking for people that had complaints. They're asking for well-rounded people. I'm just asking for you to explain to us how we're supposed to infer that this private email that is incredibly one-sided with lists of just people with complaints weren't done for the purpose of creating a record that she was difficult to work with. I think the email you're referring to, Your Honor, is the email that was drafted by Mr. Wallace. That is correct. In his private email. Correct. And I think the purpose of that email is really twofold. And if I can just go back to the discussions that he commenced in November, late November and early December of 2014, when he was starting to put together the performance evaluation for Ms. Boatwright. And there are a variety of documents between Mr. Wallace and Ms. McGovern, who is an HR representative, where the record shows that Mr. Wallace had already raised concerns regarding Ms. Boatwright's interpersonal issues and other performance issues. Again, this all predated the December 2014 complaints that you are speaking of. Once that complaint was made, the bank immediately commenced an investigation. And Mr. Wallace was among those people who were interviewed in connection with that investigation. And Mr. Wallace, in preparation for his interview, so to speak, with HR, and in preparation for being able to address some of the contentions that Ms. Boatwright was making, took notes and took notes for himself and documented. So the email you're saying is in response to the investigation. It wasn't conducted for the purpose of the evaluation. That is largely correct, Your Honor. I want to be transparent in answering your question in that I believe a number of the items on that email were taken, if you will, from the draft performance evaluation that, again, had been commenced and predated the December 2014. My colleagues will indulge me. I have one more question with respect to the evaluation. Why was she given a revenue goal for 2015 in May of 2015? With half the year done, how was it reasonable for her to expect to have met that? So, Your Honor, the record clearly reflects that the revenue goal of a million dollars that I believe you're referring to was not only given to Ms. Boatwright, it was given to every coverage banker that reported to Mr. Nagelson. The record reflects that Mr. Nagelson took over that group in April of 2015. In connection with his assumption of that leadership role of the government infrastructure group, he placed the same revenue goal on every banker reporting to him. So that revenue goal that was assigned to Ms. Boatwright, again, the same exact revenue goal. And they all got it in or approximately around April or May? Correct. And the record will show that? Correct, Your Honor. Thank you. Well, thank you very much. Justice LaValle, do you have any questions? No. Thank you very much. Thank you, Your Honor. Paragraph 34 of the complaint says, at the time plaintiff was hired, the defendant bank paid her a lower starting salary and compensation than Mr. Nagelson. Paragraph 34 of defendant's answer says defendants deny each and every allegation set forth in paragraph 34. Five months later, the amended answer says that. That's false. That's not true. The truth was what we pled in our complaint. My client was paid less than Mr. Nagelson. And they were telling the federal court in a pleading that my client was not paid less than Mr. Nagelson. This is the kind of gaslighting that shouldn't be tolerated. This is the truth. And as to the $20,000 gap that they told the EEOC, an EEOC individual could have concluded from that that this is just a discretionary gap. It's of no significance. There is a material difference between saying he was paid hundreds of thousands of dollars. Mr. Toler points us to page 2495 of the appendix, which is an attachment that has or refers to a number of additional documents that were provided by the bank. Yes, I don't have it. Including documents specifically about compensation and the email that transmits it says something along the lines of, you know, you missed these extra documents about compensation. Well, the EEOC says in its finding that for nine months we asked for additional compensation information. You refused to give it to us. So that stuff I don't have in front of me now, but I've read it. It doesn't have the true numbers in it. The true numbers, as I say, appear on page seven of my brief. It's a lot of information without the true numbers because this company was concealing the truth from not only the EEOC, but also from this court. Their first line of defense was this fabulous falsehood, which is, look, there is no difference in salary between these two people. We deny paragraph 34. Then after months of discovery and we got the truth and we got the enormous salary disparity, then they said, oh, but we have reasons. We have reasons for paying Mr. Nagelson more. And then you notice in my papers, I pointed out that at the very time that Mr. Nagelson was being hired, the vice president of human resources wrote a memo to Mr. Wallace saying, why are you paying him so much money? He hasn't seen a bonus like this in six years. That's detailed in my brief. So the company itself thought this was people, executives in the company thought there was no historical basis for starting Mr. Nagelson at such a very high salary. Counsel said that my client didn't do well in revenue in 2014. Yes, she did. She beat him. That's in the brief. She made she without any help, she with almost no help. She generated more revenue than Nagelson with five support staff did. And how did the company respond? They promoted Nagelson over her. That's how effectively demoting my client. Now, now there was very much, Mr. Oh, thank you very much. I appreciate it. Thank you for your time.  Thank you. The case is submitted and we'll move on.